## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TIMOTHY CANFIELD, ANDREW CATTANO, JAMES LETT, DENNIS PECK, STEVEN SPRATLEY, SUSAN STEBBINS, AND YVETTE TAYLOR, on behalf of themselves and all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>FCA US LLC f/k/a<br>CHRYSLER GROUP LLC<br><br>    Defendant. | Civil Action No. 1:17-cv-01789-JFB-SRF<br><br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs Timothy Canfield, Andrew Cattano, James Lett, Dennis Peck, Steven Spratley, Susan Stebbins, and Yvette Taylor on behalf of themselves and all others similarly situated, by and through their undersigned counsel, bring this action against Defendant FCA US LLC f/k/a Chrysler Group LLC, ("Chrysler" or "Defendant"). For their Complaint, Plaintiffs allege the following based on personal knowledge as to their own acts and on the investigation conducted by their counsel as to all other allegations:

## SUMMARY OF THE ACTION

1.     This proposed class action is brought by Plaintiffs in four states who allege that Chrysler concealed a known safety defect from its customers.  The defective component is the copper-bearing aluminum 2000 series metal alloy ("AL2000") valve stem and nut on vehicles equipped with a tire pressure monitoring system ("TPMS").[1]

2.     A TPMS is an electronic system designed to monitor the air pressure inside the pneumatic tires on various types of vehicles.  A TPMS reports real-time tire-pressure information to the driver of the vehicle by utilizing pressure sensors in the wheels that transmit pressure information to the vehicle's instrument cluster.

3.     The Firestone tire recall in the late 1990s, which was linked to more than 100 deaths from rollovers following tire tread-separation, prompted the United States Congress to enact legislation mandating the use of TPMS technology in all light motor vehicles (under 10,000 pounds), to help alert drivers of under-inflation events.  This legislation mandated that by 2008 all new passenger car models must be equipped with a TPMS.

---

[1] Much of the information in this Complaint, including defendant's customer complaint and warranty records, internal emails, reports, analyses, and testimony of engineers, was exclusively possessed by Chrysler and unavailable to Plaintiffs and members of the proposed class. This information was only recently made publicly available by the United States District Court for the Northern District of New York in a companion New York-only putative class action involving Chrysler vehicles with AL 2000 valve stems and nuts.  *See Tomassini v. FCA US LLC*, 3:14-cv-01226 (N.D.N.Y.) (Dkt. Nos. 116, 121, 195, and 196).

4.      The valve stem, a critical component of the TPMS, when made of improper materials, is subject to corrosion since it protrudes from each tire and is, therefore, exposed to corrosive elements like road salt.  When the valve stem fails, air can be rapidly released from the tire without warning (an "air-out") and at any speed, a condition akin to a tire blow out.

5.      As detailed herein, Plaintiffs and class members purchased Chrysler vehicles fitted with AL2000 TPMS valve stems and nuts and which were therefore defective in a manner that renders them particularly susceptible to such sudden, life-threatening failures.  This defect is unreasonably dangerous, as it can cause a driver to lose control of the vehicle, and there is often no warning before the valve stems and nuts fail.

6.      Indeed, Chrysler recognized the risk posed by a corroded valve stem and nut and, in later model vehicles, replaced the AL2000 valve stems and nuts with a new rubberized part that was less likely to corrode.  Nevertheless, Chrysler has failed to recall the inherently dangerous AL2000 valve stems and nuts or reimburse vehicle owners for the inevitable failure of this critical part.

7.      Unfortunately, the TPMS defect is as pervasive as it is dangerous.  The defect affects a number of Chrysler's most popular vehicles, including the Chrysler Town and Country Minivan, Dodge Grand Caravan Minivan, Jeep

Liberty, and Dodge Journey SUVs.  Demand for TPMS replacements parts has been so extreme that the part has often been on nationwide backorder.

8.    Each of the Plaintiffs has suffered harm as a result of Chrysler's decision not to disclose the TPMS defect.  Each Plaintiff bought or leased a 2010 Jeep Liberty, Chrysler Town & Country, or Dodge Journey.  And each Plaintiff has experienced TPMS-related problems, such as the corrosion-related valve stem break at high speeds that causes a rapid loss of tire air.

9.    Chrysler touts the safety benefits of its TPMS system.  For instance, Chrysler's brochure for its 2010 Town and Country states that, "[w]ith features such as Blind Spot Detection System, SmartBeam TM intelligent headlamps, Tire Pressure Monitoring System, and  more, Town & Country is prepared for life's unforeseen events." Available at

http://www.chrysler.com/en/pdf/2010_town_country.pdf (accessed on August 28, 2014).

10.    Chrysler has long been on notice that the metal alloy valve stems were defective and not fit for their intended purpose of properly and effectively maintaining the air pressure in tires, as detailed at length in the factual background section below.  In addition, Chrysler has been on notice of Plaintiffs' breach of warranty claims by virtue of the *Tomassini* action detailed herein, and the prior

filing of the instant action in the United States District Court for Eastern District of New York.

11.    Chrysler actively concealed and/or failed to notify the public of the existence and nature of said defect or of the possible safety issues presented by the defect.  Chrysler has not recalled the vehicles to replace the defective valve stems or nuts; it has not offered to replace the defective valve stems or nuts to its customers free of charge; and it has not offered to reimburse owners, present or past, who have incurred costs relating to TPMS valve stem or nut replacement and the necessary tire replacement.  Chrysler's conduct violates well-established consumer protection laws in a number of states.

12.    On behalf of the classes they propose to represent, Plaintiffs seek awards of damages in excess of $1,000,000, including the costs of inspecting and replacing the TPMS valve stems and nuts as well as the tires that failed as a result of air loss from defective TPMS valve stems and nuts, and equitable relief, including an order requiring Chrysler to adequately disclose and repair the TPMS defect with valve stem assemblies made of corrosion-resistant material.

## **PARTIES**

13.    Plaintiff Timothy Canfield is a citizen and resident of Marlette, MI.

14.    Plaintiff Andrew Cattano is a citizen and resident of Summit, NJ.

–5–

15.    Plaintiff James Lett is a citizen and resident of North Ridgeville, OH.

16.    Plaintiff Dennis Peck is a citizen and resident of Jackson, MI.

17.    Plaintiff Steven Spratley is a citizen and resident of Brooklyn, NY.

18.    Plaintiff Susan Stebbins is a citizen and resident of Rahway, NJ.

19.    Plaintiff Yvette Taylor is a citizen and resident of Holyoke, MA.

20.    Defendant Chrysler's present formal entity name is FCA US LLC, which is a Delaware limited liability company headquartered in Auburn Hills, Michigan.  FCA US LLC is the U.S. subsidiary of Italian multinational automaker Fiat S.p.A.  Chrysler was formally known as Chrysler Group LLC.  Defendant designs, manufactures and sells automobiles throughout the United States, including in the State of Delaware, under the Chrysler brand name and the through its Dodge and Jeep brands. Defendant does business in Delaware, advertising, distributing, and selling its vehicles through its dealer network and other outlets in the State.

## JURISDICTION AND VENUE

21.    This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act.  At least one member of the proposed class is a citizen of a different state than Chrysler, the number of proposed class members exceeds 100, and the amount in controversy

exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. 28 U.S.C. § 1332(d)(2)(A).

22.    This Court has personal jurisdiction over Defendant because it is incorporated in the State of Delaware; has consented to jurisdiction by registering to conduct business in the state; maintains sufficient minimum contacts in Delaware; and otherwise intentionally avails itself of the markets within Delaware through promotion, sale, marketing and distribution of its vehicles, which renders the exercise of jurisdiction by this Court proper and necessary as Chrysler is "at home" in Delaware. In prior submissions, when a previous iteration of this matter was pending in the Eastern District of New York and then the Northern District of New York, Chrysler admitted that it was "at home" in Delaware.

23.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c). A substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

24.    Chrysler manufactures, markets, distributes, and warrants automobiles in the United States sold under various brand names, including the "Jeep", "Dodge" and "Chrysler" brands. This lawsuit concerns "Class Vehicles," which is

defined as including all Chrysler vehicles manufactured after June 10, 2009[2] that used the same TPMS metal alloy valve stem and nut, including, without limitation, the 2010 model year Jeep Liberty, the 2010 model year Dodge Journey and the 2010 model year Chrysler Town & Country.

## THE TIRE PRESSURE MONITORING SYSTEM
## (TPMS) VALVE STEM AND NUT DEFECT

25.    From 2008 onward, Chrysler, through its dealerships, employees, agents, and servants, represented to the public that the Chrysler Class Vehicles containing the defective valve stems and nuts were in good condition and fit for their intended purpose.  This representation allowed Defendant to place the Class Vehicles in commerce and profit from their sales.  However, Chrysler knew from the time of manufacture that the TPMS valve stems and nuts were made out of metal alloys that could not sufficiently resist corrosion; therefore, the Class Vehicles contained a dangerous, inherent defect from the point of manufacture.

26.    Chrysler's notice of the TPMS defect derived from, among other things, Chrysler's own knowledge about the corrosion risks to car parts made from

---

[2] Plaintiffs have selected this class date solely because it is the date at which Chrysler emerged from bankruptcy.  There are, nevertheless, many Chrysler-brand vehicles on the road manufactured before June 10, 2009 with the defective valve stems that have caused problems for numerous plaintiffs across the country. Plaintiffs will reference the complaints concerning vehicles manufactured before June 10, 2009, included herein, as evidence of the inherently defective nature of the valve stems.

metal alloys that do not sufficiently resist corrosion, feedback, both directly and through its dealers, from its customers during repairs, complaints in the National Highway Transportation Safety Administration ("NHTSA") database beginning as early as July 2009, and a Transport Canada Active Defect investigation of the Chrysler Minivans' corroded valve stems opened in October 2010.    Transport Canada,      Active      Defect      Investigations,      available      at: http://www.tc.gc.ca/eng/motorvehiclesafety/safevehicles-defectinvestigations-information-active-1239.htm (accessed on August 11, 2014).3

27.    As early as January 27, 2009, Chrysler's third-party supplier, Continental Automotive Systems US, Inc. ("Continental"), provided a presentation notifying Chrysler that "[t]he corrosion resistance of the 2000 series is inferior to the corrosion resistance of the 6000 series (6061).  This resistance is mostly linked to the amount of copper found in the alloy."  The supplier recommended Chrysler make a common change in the base material used for its valve stems and nuts to AL6000, but also noted "this new alloy carries an additional cost."

---

3 The Transport Canada investigation was later deactivated.  Based on information, belief, and documents that Plaintiffs' counsel acquired from an open records request with the Canadian government, this investigation was deactivated because of omissions and misrepresentations that Chrysler gave to Transport Canada, including that Chrysler would inspect and replace defective valve stems when its customers' tires were changed.  Even assuming, for the sake of argument, that this happened in Canada, it absolutely did not happen in the United States.

–9–

28.    Chrysler knew about the defect from the large number of back orders of replacement parts and the number of customers waiting for parts.  As one Chrysler engineer recently testified, "what prompted the investigation [into using another supplier] was the high number of back orders. Just the high number of back orders and customers that we had waiting for parts."

29.    Chrysler's analysis of its warranty databases indicated that tens of thousands of TPMS units had been replaced in 2005-2010 Chrysler vehicles. Many entries in the warranty claims database noted that valve stems or nuts had "broken or cracked" or had "leaks" during the relevant period.

30.    On April 6, 2009, the pervasive problem with broken and cracked valve stems and nuts led to the creation of a "Black Belt" project to determine the cause of the broken and cracked stems and nuts.  A "Black Belt" is someone who has been specifically trained in problem-solving techniques, and a Black Belt project is led by someone with a Black Belt using those techniques.  The Black Belt project continued through at least August 11, 2009 and entailed collecting data and testing failed parts.

31.    By April 2010, Chrysler concluded – as evidenced in an internal Chrysler email dated April 19, 2010 – that the "2011 alloy that being [sic] used

now is definitely prone to stress corrosion cracking (SCC), while 6000 series is not susceptible to this type of corrosion."

32.    Another internal Chrysler email – this one dated April 29, 2010 – stated that "[t]he material report is complete and attached.  Stress Corrosion and Cracking is believed to have caused the failures," which can produce "catastrophic cracking, often leading to devastating and unexpected failure."

33.    An internal email from May 21, 2010 also referenced the "TPM breakage issue, and process changes on the … stem," and noted that there was "next to no breakage on the competitors stems …."

34.    Chrysler completed two reports about the defective TPMS units at this time.  The first – Materials Engineering Lab Report (dated April 21, 2010) – begins by reciting the history of the TPMS part as simply "[s]everal field issues have been re[p]orted from fleets related to the TPS."  The report relays that microscopic analysis of several TPMS parts was conducted and that "[b]y the evidence collected during this examination, it is concluded that each of the valve stems fractured due to SCC [stress corrosion cracking]."  It also noted the well-recognized fact that "[a]luminum alloys with a higher copper content [such as AL2000] are susceptible to SCC …."

35.    The second Chrysler report – also titled Materials Engineering Lab Report (but dated April 1, 2011) – stated "[t]his tire pressure monitor/valve stem failed in Europe on a 2009 JC it is a safety office request."  The report concluded: "The fracture was most likely caused by Stress Corrosion Cracking due to the presence of Chlorine (Cl).  This is a well-known phenomenon in copper containing aluminum alloys."

36.    Chrysler made the change to AL2000 from AL6000 in later models as reflected in an internal "Change Notice Worksheet," which states that the "[c]hange [was] made due to warranty claims in the field. Valve stems and nuts have broke [sic]."  The Change Notice Worksheet indicates, under the reason for "Why Are We Making This Change?," that Chrysler is "[g]oing From Al2000 to Al6000 to improve robustness of the sensor valve stem." *Id*. Under the section titled "What is the Technical Solution?," the Change Notice indicated "Change Material to AL6000."

37.    Faced with the high number of reported failures, Chrysler considered a field action or extended warranty for the AL2000 valve stems and nuts.  Chrysler used a "Weibull analysis," a well-known method for making reliability predictions, and found that there would be 70 TPMS failures out of 1,000 for 36 months in service (i.e. a 7 percent failure rate at three years).

–12–

38.    Chrysler's Weibull analysis further determined that the failure rate would reach 180 – 250 out of 1,000 at 60 months in service, or 18 percent to 25 percent at five years under "normal use."

39.    Shockingly, the failure rate was expected to "max out" when the tires were changed (as was expected in five years), and had the "potential to be 4x with all four sensors at once."  Thus, *Chrysler predicted up to a 100 percent failure rate within five years*.

40.    In addition to the Black Belt project, lab reports, and multiple reports received from Continental, Chrysler was put on notice of the defect by several engineers who worked in other departments but who personally owned Chrysler minivans and had experienced the defect.

41.    One Chrysler engineer complained about the defect on his 2009 minivan and wrote, in part, the following:

a.    "[My Wife] . . . attempted to fill the tire with air. While doing this the TPM Sensor Schrader Valve broke into two pieces and all air was lost in the tire."

b.    "[I]t is in a garage every night. We take good care of the car and do not expect problems like this. Our Minivan is two years old this week with 24,000 miles on it."

   c. "In addition, when my Wife mentioned this issue to a friend at a party on Saturday Night, he told my wife that he has replaced 3 of these on his 2008 Dodge Ram at $ 50 each, and just had one on his Dodge Journey that destroyed the tire because his wife drove too long on the tire."

   d. "Let me know if you think I should discuss the replacement of the other three valves. My wife is concerned about this issue and that it's a known concern with the local Tire Shops."

  42. Faced with this complaint, another Chrysler engineer, who ironically had a valve stem on her own vehicle fail, noted in an email:

> This is not the first customer that is trash talking us due to this part failure. Interestingly [another Chrysler engineer] is seeing that most of the sales are non-warranty. I'm wondering if most customers are being told it's customer pay.

  43. Another Chrysler engineer complained about the defect in his 2009 minivan and the fact that he had to spend $520-$600 for new TPMS units:

> [T]he tire center manager . . . [t]old my wife that there might be a problem before he ever saw the vehicle. Based on his inspection - he indicated he could not work on the Vehicle to install new tires because all 4 valve cores were "seized" in the TPM. His advice was that we need to go to the dealer and purchase 4 new TPM's and have them replace at the dealer before he would [ ] install the new tires.

> Since this was new to me, I asked several internal contacts about this issue - and I reviewed the parts on the vehicle. It appears that [the tire center manager] [i]s correct in his identification of the condition - and that his recommended action is the only available alternative. I spoke

with Suburban Chrysler - Where we purchased the vehicle - and was given a rough estimate of $130/sensor plus labor to do this work. As a customer - this is very disappointing since the issue may have been present but was not identifiable by a customer until I tried to spend $550 for new tires.

Now it appears I will need to spend $520-600 additional and make two additional trips to a service facility to get the issue resolved.

44.     Another Chrysler engineer recently testified that he shared this concern over the replacement cost, stating that "it's not surprising why customers get upset with cost especially when they need something like a replacement sensor valve stem."

45.     A reasonable consumer must be upset over the cost of replacing valve stems and nuts, particularly because there is no replacement interval noted for TPMS units in the owner's manual and the units' battery is expected to last 10 years.

46.     Reasonable consumers expect that a vehicle – and its safety features – to last at least this long. The typical car on the road in the United States is 11.5 years old.  The number of vehicles that are 16 to 24 years old is 44 million.  The number of vehicles on the road that are at least 25 years old is about 14 million.

47.     The employees listed above are hardly the only Chrysler employees to complain about broken AL2000 valve stems and nuts on their personally owned Chrysler vehicles.  A Chrysler engineer recently testified that she personally was

aware of valve stem failures experienced by at least three other Chrysler employees, including her husband, who had several failures.

48.    Chrysler, through its dealerships, agents, servants, and employees, was also put on actual and/or constructive notice of the defective valve stem from Chrysler's Customer Assistance Inquiry Records ("CAIR") and National Highway and Traffic Safety Administration Office of Defects Investigation (NHTSA-ODI) reports dating back to July 2009, and most likely earlier.  The NHTSA-ODI website allows consumers to "identify and report problems you might be having with your vehicle, tires, equipment or car seats." *See* https://www-odi.nhtsa.dot.gov/ivoq/ (last accessed August 7, 2014) ("If you think you have a problem, we want you to tell us about it.").

49.    The Office of Defects Investigation reviews and analyzes complaints to determine whether to issue recalls.  The Vehicle Safety Complaint filing form specifically includes required fields for the name, telephone number, and email address for the complainant, in addition to the VIN number for the vehicle (which are apparently tested by an online database). *See* https://www-odi.nhtsa.dot.gov/VehicleComplaint/index.xhtml (last accessed August 7, 2014). NHTSA-ODI does not share complainants' personal information with the general public, and a complaint is added to a public NHTSA database only after it removes

–16–

all information from complaint fields that personally identify a complainant. *See*

https://www-odi.nhtsa.dot.gov/ivoq/ (last accessed August 7, 2014).

50.    NHTSA-ODI specifically states on its website that:

Government analysts review each complaint in a timely fashion. If warranted, the Office of Defects Investigation (ODI) will open an investigation to determine if a safety defect trend exists. Some of these investigations result in safety recalls.

While you may or may not be contacted by a NHTSA-ODI investigator to clarify the information submitted, all reports are reviewed and analyzed for potential defects trends.

Thus, NHTSA-ODI complaints are made by individuals who must identify themselves and enter detailed contact information and an accurate VIN number, and these complaints are reviewed and analyzed by the federal government.

51.    NHTSA-ODI reports over 160 complaints, specifically concerning defective valve stems and nuts in vehicles of the same make and model as those of the Named Plaintiffs.  True and accurate copies of these complaints are attached hereto as Exhibit A.  The following quotes are drawn from the complaints compiled in this exhibit.

52.    A number of these complaints allege that owners of these vehicles contacted Chrysler directly about the defect as early as March 2010:

–17–

- "I requested that fourth TPMS be replace[d], however, the local dealership and Chrysler HQ Customer Service adamantly refused to replace the remaining one."

- "Chrysler is not willing to do anything as far as warranty or defective parts [are] concerned. Their service writer's opinion was- 'well, you do live in the Northeast and we do get poor weather.'"

- "[H]e was told the second valve would not be replaced under warranty because it was cracked. The consumer stated he was unable to inflate the tire."

53.    A number of these complaints allege that Chrysler was notified of the failure:

- "Manufacturer was made aware of the problem [but] did not offer any assistance".

- "The manufacturer was notified and stated they would replace it but the contact had to pay for the repair."

- "The dealer was notified of the failure and they informed the contact that the part needed for repairs was on backorder for a period of two to three months."

54.    Owners have been told by Chrysler representatives that others had a substantial issue with TPMS valve stems and nuts corroding and failing, and that the failure was so common that the TPMS valve stems were on backorder:

- "Valve stems have metal threads at end that were broken prior to purchase of vehicle.  Dealer working to replace but have been told there is a large number (approx. 20,000 on back order)."

- "The vehicle was driven to the dealer where the contact was informed that the failure was common but he would need to purchase a replacement."

- "The dodge dealership says this is a common occurrence but will not cover it under warranty."

- "Told by dealership this is a common problem with these tire pressure sensor valve stems on dodge caravans."

- "The dealer replaced the sensor with a rubber valve stem. The contact stated that the air sensor was on back order and he did not know when they would be available."

- "First time this happened it was several weeks before they could replace the stem for us Because they were on back order...there had been so many problems they couldn't keep up!"

–19–

55.    Several complaints allege that Chrysler Dealerships acknowledged the pervasiveness of the valve stem problem during the repairs:

- "I contacted Golling Chrysler [and] I spoke with the service person.... I asked him if there were others were having similar problems with the valve stems. He indicated that they were having problems with them. I then asked him if Chrysler was having problems with the stems why the other two stems had not been replaced. He advised that Chrysler has indicated that good stems should not be replaced. I asked if he would guarantee those two stems and he indicated he would not because of the problems they were having."

- "The Dodge Dealerships says this is a common occurrence but will not cover it"

56.    One owner even remarked that the dealership ran out of their stock of valve stems and nuts.  This comes as no surprise, since a significant number of complaints report repeated instances of failing valve stems and nuts.

- "Tire valve stem broke, resulting in an immediate flat tire. This is the second failure on this vehicle. I have had this happen on more than one of the same make & model of vehicles."

- "The sensor has now broken off three separate tires."

- "For the second time the valve stem is defective and corroded."

- "Within less than 3 months all four stems have broken."

57.    Accordingly, based upon these admissions by Defendant's authorized representatives, Defendant was aware of the inferior quality and workmanship of

the TPMS valve stems and nuts, and that the components would corrode and fail due to the defects.

58.    The complaints all allege that, upon inspection of the deflated or deflating tire, the valve stems had corroded to the point that they broke when touched.  By way of example, below are images of a corroded Chrysler TPMS valve stem from a Town & Country minivan:









59.    Defendant's defective valve stems pose a significant safety risk to drivers.  A number of owners reported that their tires failed due to corroded valve stems while they were driving at highway speeds:

- "Low pressure light came on while driving 70 MPH… pulled over to check tire… while checking the tire pressure in tire the TPMS sensor/valve stem broke causing all of the air to escape from the tire."

- "While driving approximately 55 MPH, the tire sensor unit indicated that one of the tires was low on pressure and the rear driver's side tire became flat. The contact mentioned that the tire valve had failed."

- "Blown tire and valve stem *TGW while driving 65 MPH";

–23–

- "While driving (at 30 MPH) in our 2008 Dodge Caravan, the right front TPMS valve stem broke off and the tire immediately deflated.... Moved vehicle to side of road."

- "While driving approximately 50 to 55 mph, a warning indicator illuminated and a tire flattened.  The vehicle was taken to a mechanic who stated that the valve stem disintegrated and the sensor fell inside of the tire."

60.     The failure becomes especially dangerous when driving at high speeds because the tires deflate instantly and without warning.

- "Front valve stem broke driving on the highway causing the tire to immediately go flat."

- "Tire valve stem broke off while at highway speed causing the tire to immediately deflate."

- Tire went flat in "less than 8 seconds."

- "Tire sensors blowout or failed without any prior notification."

- "Corroded nut on left front wheel valve stem allowed the stem to drop into the tire resulting in sudden loss of air pressure in tire.  There was no warning prior to very sudden flat tire."

–24–

- "I was driving 50 MPH on a paved highway. The air pressure light came on. A few seconds later there was a rumble noise. I pulled over and looked at the tires. One was completely flat. I had thought that I ran over something very large causing an instant flat. After removing the tire, we noted that the tire was still good. The nut holding the valve stem/pressure sensor in had broken. The valve stem/pressure sensor component was found inside the tire. The result was a very large gap where the valve stem was, allowing the tire to instantly deflate. When checking the other valve stems, one of the other nuts holding the valve stems in was also broken. The Jeep is parked until we can remove all of the valve stems and replace them. We will not drive it as it is. We will be replacing the valve stem/pressure sensor component with the old fashion style valve stems. I would not continue to drive the vehicle with the stock equipment. I would always worry about what would happen if the valve stem broke on a front tire going expressway speed in heavy traffic."

61.    An instantaneous tire deflation can cause drivers to lose control of their vehicles, especially a rear tire failure at speed. Losing half of the rear cornering stiffness leaves a driver with an over-steering vehicle characterized by

much higher steering gain, yet with a very long response time. The ultimate cornering force capacity of the vehicle-rear is reduced to almost half.

62.     Because of this long response time, a driver attempting a quick maneuver may initially sense the vehicle is not reacting and apply more steering input. When the vehicle does respond a second or two later, this natural reaction, combined with the above mentioned higher steering gain, makes it very likely the car is going to over respond. Also, having halved the ultimate lateral force capacity of the rear of the vehicle, it is very easy to spin out. The vehicle is now more stable going backward. Unfortunately, while the vehicle is sideways, it is also possible for the sliding rim of the failed tire to dig into the pavement or for the car to hit a curb or other hazard or to go off the road and trip in soft soil.

63.     The NHTSA complaints demonstrate that drivers have experienced loss of vehicle control because tires have deflated instantly and without warning due to the TPMS valve stems:

- "Valve stem broke off two time [2] on separate occasions, caused tires to lose air quickly, and resulted in tire failure and a loss of control, car crashed into curb."

–26–

- "The second one [failed] while I was driving the vehicle... My children and I could have been killed if I didn't pull over immediately."

- "2008 Chrysler Town&Country, left front tire blew out and driver lost control of the vehicle. Drove off the right side of the roadway striking the right of way fence. … The consumer suffered a minor shoulder injury."[4]

64.    Owners of Class Vehicles may not only lose control of their vehicle, but may also become stranded in unsafe locations due to the failure of the TPMS valve stems:

- "Twice in the past two months the aluminum valve stems that hold the TPMS sensors on our Grand Caravan have broken off. 1st incident in April while vehicle was parked in driveway and second while my wife and children, age 5 and 4 years, were traveling at highway speeds. The second incident stranded my wife and children in 100+ degree heat for close to an hour while they had to wait for AAA to arrive and change the spare for them."

- "Two vehicles required towing due to unsafe location at time of failure."

- "Car picked up from Frank Stifter where he indicated only one valve stem was bad. I asked that he show me what he saw and

_____

[4] The NHTSA report did not note the cause of the tire blow out but, given the volume of valve stem failures and the failure to note a cause obvious to a layperson (such as hitting an object), it is fair to infer that a valve stem caused this accident.

–27–

shared with Frank that our mechanic warned and documented two front stems bad. He insisted only one and showed me. After leaving I went back to Wolbert Auto who specifically showed me that not only were the front two corroded and cracked (nut and valve) but that the back two were already corroding and could soon crack. Same day 07/07/2011 called Chrysler and indicated they may want to replace all four and that it is a safety issue. Later on 07/07/2011 took my two daughters to movies and tires fail on exit... Thank goodness I was on a ramp and not 79 S at a much higher speed. My children were devastated."

- "We had the dealer replace the TPM valve stem but they had to order it and it took a week to get the part. I asked them to change the other 3, but they said they will only replace one valve at a time as they fail. My wife was 9 months pregnant at the time and this is our only car, so I was concerned that it would happen again, possibly while driving since it had broken so easily. Sure enough, two weeks later a second valve stem failed and the tire went flat very fast. Luckily, I was just on my way back to the hospital to bring her a few things and driving slowly on a residential street."

65.    Defendant's defective valve stems not only require owners of Class Vehicles to risk their safety and pay for replacement valve stems but, also, to replace tires that were destroyed as a consequence of the defect.

- "One vehicle also required replacement of brand new tire that was destroyed at the time of rapid deflation"

- "The almost new tire (less than 25,000KM) was also destroyed in the process of bring the vehicle to a safe stop."

- "Tire was part of a new set of four bought only 2 days before and had approx. 400 miles of usage."

66.    Internal Chrysler Customer Assistance Inquiry Records ("CAIR") reports also put Chrysler on notice of the defect and the dangers it posed:

- "On August 8, 2011 a customer reported to Defendant's CAIR unit he had a blowout at 41,500 miles and had the vehicle towed to the nearest repair shop. While having one of the tire pressure monitors replaced, the repair shop told the customer that the other three tire pressure monitors were ready to break as well."

- "Customer is concerned about tire pressure monitoring sensors failing and causing incident where vehicle went off road.  Customer states that their vehicles tire pressure monitoring system failed when wife was taking someone to doctor and vehicle went off the road. One tire was damaged and replaced as well as the valve stems."

- "[C]ustomer was almost in an accident when the tire went out due to the sensor disinigrated [sic] causing the tire to loose [sic] pressure and be destroyed."

67.    Chrysler's failure to address the defect in its TPMS valve stems continues to this day.  Forums for tire replacement companies provide yet another example of this longstanding problem that Chrysler refuses to address.  Multiple representatives in the industry specifically identify Chrysler vehicles as ones that suffer from this defect more than those of other car manufacturers. *See* Jim Smith, Readers Comments: TPMS Sensor Corrosion a Big Issue, November 8, 2012, http://www.tirereview.com/reader-comments-tpms-sensor-corrosion-a-big-issue/

–29–

("We have seen more corrosion on Chrysler/Dodge/Jeep vehicles than others [and] I do see a problem with sensors on Chrysler cars to be more than other brands."). In the comments section of the post, readers have added comments detailing their bad experiences with valve stemsas recently as April 2016.

68.    A forum for Dodge users lists comments, most recently from December 2014,from several drivers who have experienced TPMS failures. *See* "TPMS's cracking.   Am I the only one???" by BLM, Nov. 16, 2009, http://www.dodgejourneyforum.com/topic/989-tpmss-cracking-am-i-the-only-one/

69.    Beyond the individual consumer complaints, Chrysler was put on notice by a major fleet customer, GE Capital, which was concerned with the safety implications of sudden air-outs.

70.    In a 2010 email, a Chrysler Regional Fleet Manager reported that "GE Capital is a large Fleet Ac-count that raised this issue at a Client Advisory Meeting (CAB) meeting yesterday held at CTC [Chrysler Technical Center] and feel it is a Safety issue."   The Regional Fleet Manager more fully expressed GE Capital's concern as follows:

> [W]e have a Large Fleet Account, GE Capital, who has surfaced the below issue during a Fleet Client Advisory Board meeting at CTC yesterday and based on the feedback and postings from the Automotive.com website, stating that there are nu-merous issues with TPS valves, they are considering grounding their units until we can establish a plan.

Can you let me know if there is anything pending that we can share
with this Fleet?
Can we be proactive and provide them with an inspection procedure
to provide to their drivers in efforts to prevent their drivers to become
stranded on the side of the road?

71.    Chrysler was also placed on notice of the subject safety issues by its
European affiliates. In one email, dated March 19, 2014, a Chrysler employee
stated, "We are getting a lot of heat from the Euro community: re our TPM's
falling out …"

72.    In another email the same day, prioritized as "Significant," the
problem was described as "TPM nipple falls off without any external influence."

73.    This email chain went on to state that the "situation is escalating, we
receive cases from our Call center, where customers refuse to drive their vehicles
any more before there is a clear solution for service."

74.    Chrysler was also on notice of the safety issues because there have
been at least three prior NHTSA investigations or sanctioned recalls relating to
broken valve stems or nuts.   Indeed, a NHTSA report has found that "[t]ire
problems are inherently hazardous to vehicle safety. When these problems emerge
in the pre-crash phase, the time window for at-tempting a crash avoidance
maneuver is normally very small." *Tire-Related Factors in the Pre-Crash Phase*,
April          2012,          at          p.          15,          available          at

–31–

https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/811617 (last accessed Jan. 22, 2018).

75.    Faced with an expected potential failure rate of 100%, Chrysler considered its options for a field action or extended warranty and tasked its employees with drafting a Customer Satisfaction Notification (CSN) document. The resulting CSN recounted the background of the AL2000 valve stem and nut defect, forecasted the expected volume of warranty claims, and summarized reports of the defect in the field, including CAIR records, VOQs [NHTSA Vehicle Owner Quality reports like those excerpted above], and QNA (Quality Narrative Analyzer) field reports.

76.    The CSN went on to state that "Chrysler Group LLC is not aware of any accidents or injuries related to this issue (*if true*)." *Id.* (emphasis supplied). As shown above, Chrysler was well aware of the safety issues created by the defect. The CSN document ended with the "Recommendation" to "[p]rovide an extended warranty for the TPM sensor" *Id.*

77.    In the face of this well-documented recommendation, Chrysler rejected providing an extended warranty or taking any field action due to the "significant cost"—approximately $400 million—and the fact that supplier did not have the production capacity.

78.    As one internal Chrysler email stated, "There was no extended warranty or field action for this item.  The supplier did not have the capacity and the price tag was approx $400M."

79.    Chrysler changed the design of the TPMS valve stems sometime in 2011, moving toward the use of corrosion-resistant rubber rather than metal alloy.

80.    Despite over 160 NHTSA complaints, online forums discussing the issue, an open Transport Canada investigation on the defect, and actual notice from its consumers, directly and through its dealers, Chrysler has failed to: (1) disclose the existence of the TPMS valve stem defect to consumers, (2) inform them of the safety issues presented, (3) replace the valve stems bound to fail, or (4) reimburse owners for prior repairs.

81.    Moreover, Defendant has continued to replace the defective valve stems with valve stems made of the same metal alloys that could not withstand corrosion in the first place, as evidenced by the following NHTSA complaints:

- I contacted Golling Chrysler on Telegraph Road in Bloomfield Hills, MI. I spoke with the service person, adam, the problem was fixed it in about an hour and a half. My daughter advised me that her father--in--law had a similar problem with the valve stems on his Ch[r]ysler vehicle. I asked Adam about the valve stems on the two front tires. He indicated that those stems were checked and there were no problems with them. I asked him if there were others were having similar problems with the valve stems. He indicated that they were having problems with them. I then asked him if Chrylser was having problems with the stems why the other two stems had not been

–33–

replaced. He advised that Chrysler has indicated that good stems should not be replaced. 2009 CHRYSLER TOWN AND COUNTRY NHTSA ID Number 10445109 (January 24, 2012)

- 2009 Dodge Grand Caravan valve stem failure. In Nov we went out for Thanksgiving supper come out and found front left tire flat, valve stem was broken off and could not find cap or valve. Van had about 38,000 on it. This Sunday pulled back into drive and in matter of seconds rear right went flat. Found same problem. Went over to check left rear and found crack in stem within 1/32" below cap, I called for new stems dealer is out of stock so the van must sit. I will have to put rubber stems in and deal with the light so I can use the van. Now what would happen if my wife or myself with kids and grandkids are on a trip busy roads, lots of traffic and this would happen. When these blow tires are flat in seconds. Its makes me afraid to drive [knowing] this could happen. $74.25 each per stem not including labor. This is not fair or should not be [allowed] on vehicles. 2009 DODGE GRAND CARAVAN NHTSA ID Number 10411902 (July 11, 2011).

82.    Chrysler not only nixed its internal recommendation for an extended warranty program or other field action, but also buried its findings from its customers.  Defendant never revealed the defect to its customers or allowed its dealers or repair facilities to inform owners like Plaintiffs.

83.    Rather, Defendant's CAIR unit made statements to consumers like: "this is how this vehicle was designed, engineered and built. Any additional information is either unavailable or considered proprietary."

84.     Chrysler's own documents indicate that it never disclosed the defect to customers. For example, one Chrysler employee asked in an email "was there anything distributed to the field on this issue[?] To my knowledge none."

85.     And while Chrysler officials spoke candidly to its own engineers who complained, customers who were not Chrysler employees were given no information about the defect.

86.     The durational limitations in Chrysler's Limited Basic Warranty, as applied to Plaintiff and Class Members, are unconscionable.  Chrysler knew about the inherent defect in the valve stem at various points, including: (1) when it manufactured the valve stem from metal alloys (which cannot sufficiently resist corrosion), (2) when individuals began to lodge complaints with NHTSA as early as July 2009, (3) when Transport Canada opened its investigation into the defect in October 2010, and/or (4) when Defendant determined that AL2000 valve stems and nuts were susceptible to stress corrosion cracking, (5) when Defendant undertook its analyses and failure rate predictions as detailed herein which were made available and unsealed in the *Tomassini* action, and (6) before Plaintiffs purchased their Chrysler vehicles.  Still, Chrysler opted not to warn the potential or eventual purchasers about the defect.  Moreover, Chrysler limited the Limited

Basic warranty to three (3) years or thirty-six thousand (36,000) miles to insulate itself from liability once the corroded valve stems failed.

87.    Chrysler has never disclosed the TPMS defect to drivers or potential purchasers or lessees of Class Vehicles, and Chrysler has never instructed its dealerships to disclose the TPMS defect to drivers or potential purchasers or lessees of Class Vehicles.

88.    The TPMS defect was not known to or reasonably discoverable by the Plaintiffs and proposed class members before purchase or lease, or without experiencing the defect first hand and exposing themselves to an unreasonable safety risk.

89.    Chrysler has remained publicly silent even as it has privately acknowledged the defect, conducted internal investigations, observed the TPMS replacement parts go on national backorder, responded to a Transport Canada investigation, and learned of hundreds of complaints about Class Vehicles directly from its customers and from NHTSA.

90.    As a result of Chrysler's inaction and silence, many consumers are unaware that they purchased, and continue to drive, unsafe and unreliable vehicles. As Chrysler knows, a reasonable person would consider the TPMS defect important and would either not purchase or lease a vehicle with the TPMS defect

were the defect disclosed in advance or would pay substantially less for the vehicle.

91.    Plaintiffs neither knew, nor could have known, about the defective materials Chrysler used to manufacture the TPMS valve stems at the time they purchased their Class Vehicles.  Chrysler knowingly manufactured vehicles that contained an inherent defect, but did not inform Plaintiffs of the problem when they agreed to purchase their Class Vehicles or any time thereafter.  Further, Chrysler's warranty intentionally limited the company's liability for the known defect, and Plaintiffs and putative class members never had the opportunity to bargain for a warranty that would have covered the defect because they had no knowledge about its existence.  As such, Chrysler's material omission concerning the existence of the defect rendered the warranty unconscionable as applied to Plaintiff and Class Members.

92.    Many purchasers and lessees of Class Vehicles have spent hundreds of dollars on TPMS repairs and related expenses, such as towing costs.

## PLAINTIFFS' EXPERIENCES

### Timothy Canfield

93.    In January 2013, Plaintiff Timothy Canfield purchased a used 2010 Dodge Journey with 15,000 miles from a dealership in Caro, Michigan.  Mr.

Canfield's Dodge Journey came with defective TPMS valve stems. Chrysler did not disclose this fact to Mr. Canfield, who greatly values vehicle safety.

94.    Mr. Canfield uses the Dodge Journey for family travel on roads near his residence in Marlette, MI, where salt is used in the winter.

95.    From the date of purchase to the present, Plaintiff has serviced his vehicle in a timely and proper manner.

96.    Mr. Canfield has paid out-of-pocket to replace two defective TPMS valve stems after separate incidents. On both occasions, Mr. Canfield was driving his Dodge Journey when the TPMS light flashed on his dashboard immediately before a nearly instantaneous air-out of one of his tires. After both incidents, Mr. Canfield located the valve stems from the affected tires and found that they nearly crumbled in his hands because they were embrittled from corrosion.

97.    After the first incident, which occurred in December 2015, Mr. Canfield had his vehicle serviced at a Walmart in Sandusky, Michigan, where he paid out of pocket to have his valve stem replaced. He has never received a reimbursement from Chrysler.

98.    After the second incident, which occurred in January 2016, Mr. Canfield had his vehicle serviced at Belle Tire in Lapeer, Michigan, where he paid

out of pocket to have his valve stem replaced. He has never received a reimbursement from Chrysler.

### Andrew Cattano

99.     In 2010, Plaintiff Andrew Cattano purchased a 2010 Jeep Liberty from Salerno Duane Jeep Chrysler Dodge Dealers in Summit, NJ. Mr. Cattano's Jeep Liberty came with defective TPMS valve stems. Chrysler did not disclose this fact to Mr. Cattano, who greatly values vehicle safety.

100.    Mr. Cattano uses the Jeep for family travel on roads near his residency in Summit, NJ, where salt is used in the winter.

101.    From the date of purchase to the present, Plaintiff has serviced his vehicle in a timely and proper manner.

102.    On May 23, 2015, Plaintiff was driving his Jeep with his wife on Interstate 95 when the TPMS light came on his dashboard and, almost immediately, the right rear tire suddenly and unexpectedly had an "air-out." Despite his initial loss of control, Mr. Cattano successfully pulled the car over and observed that the TPMS module was missing entirely, leaving a gaping hole in the tire's sidewall.

103.   When Mr. Cattano had his vehicle serviced, the mechanic showed him that the TPMS valve stems on the three other tires had begun to crack and could similarly fail at any given moment and, therefore, needed to be replaced.

104.   Mr. Cattano paid out-of-pocket for the replacement of four TPMS valve stems and a new tire.  He has never received a reimbursement from Chrysler.

**James Lett**

105.   In March of 2010, Plaintiff James Lett purchased a new 2010 Chrysler Town & Country from the Ed Tompko Chrysler dealership in Avon Lake, Ohio. Mr. Lett's Chrysler Town & Country came with defective TPMS valve stems. Chrysler did not disclose this fact to Mr. Lett, who greatly values vehicle safety.

106.   Mr. Lett uses the Chrysler minivan for family travel, including to transport his young children, on roads near his residence in North Ridgeville, Ohio, where salt is used in the winter.

107.   In June 2014, Mr. Lett's wife was driving down a state road at a speed of about 45 mph – with Mr. Lett as a passenger – when a tire suddenly and unexpectedly had an "air-out."  Despite her initial loss of control, Mr. Lett's wife successfully pulled the car over and, upon inspecting the blown tire, Mr. Lett observed that the source of the air-out was a corroded valve stem.  Mr. Lett paid

out-of-pocket to replace the defective TPMS valve stem. He has never received a reimbursement from Chrysler.

108. In the summer of 2015, Mr. Lett observed that the three other TPMS valve stems were cracked, and that the fourth one was corroding again. Mr. Lett paid out-of-pocket to replace the four defective TPMS valve stem. He has never received a reimbursement for these expenses.

### Dennis Peck

109. In approximately June of 2010, Plaintiff Dennis Peck purchased a new 2010 Dodge Journey from O'Hara Chrysler Dodge Jeep in Clinton, Michigan. Mr. Peck's Dodge Journey came with defective TPMS valve stems. Chrysler did not disclose this fact to Mr. Peck, who greatly values vehicle safety.

110. Mr. Peck uses the Dodge Journey for family travel on roads near his residence in Jackson, MI, where salt is used in the winter.

111. From the date of purchase to the present, Plaintiff has serviced his vehicle in a timely and proper manner.

112. On March 3, 2015, Mr. Peck was driving on a four-lane road to Jackson Airport when he heard a loud noise – as if another car had hit him. Mr. Peck saw the TPMS warning light come on the dashboard, felt the vehicle pull to the left, and pulled over to the side of the road. A tire had suddenly and

unexpectedly experienced an "air-out."  Mr. Peck observed that the TPMS module was missing entirely and left a gaping hole in the tire, which was the obvious source of the air-out.

113.   Mr. Peck paid out-of-pocket to have the vehicle towed and replace the tire along with the defective TPMS valve stem.  He has never received a reimbursement from Chrysler.

### Steven Spratley

114.   In 2012, Plaintiff Steven Spratley purchased a certified, pre-owned 2010 Chrysler Town & Country minivan with about 65,000 miles from Hudson Chrysler Jeep Dodge in Jersey City, New Jersey.  Mr. Spratley's Town & Country came with defective TPMS valve stems.  Chrysler did not disclose this fact to Mr. Spratley, who greatly values vehicle safety.

115.   Mr. Spratley uses the minivan for family travel on roads near his residence in Brooklyn, NY as well as elsewhere, including New Jersey.  Salt is used to treat the roads in winter in both areas.

116.   From the date of purchase to the present, Plaintiff has serviced his vehicle in a timely and proper manner.

117.   In early 2015, after experiencing a leak in the tire, Mr. Spratley took the vehicle in for repair.  When the mechanic attempted to put air in the tire, he

observed that the TPMS valve stem was cracked.  The mechanic observed that one other TPMS valve stem on the vehicle was cracked as well.  Mr. Spratley personally saw the cracked valve stems and observed that one was nearly split in half.  Both TPMS valve stems, therefore, needed to be replaced.

118.    Mr. Spratley paid out-of-pocket for the replacement of two TPMS valve stems and he has never received a reimbursement from Chrysler.

### Susan Stebbins

119.    In August of 2012, Plaintiff Susan Stebbins purchased a used 2010 Dodge Journey in New Jersey that had 37,000 miles on it.  Ms. Stebbins' Dodge Journey came with defective TPMS valve stems.  Chrysler did not disclose this fact to Ms. Stebbins, who greatly values vehicle safety.

120.    Ms. Stebbins uses the Dodge Journey for family travel on roads near her residency in New Jersey, where salt is used in the winter.

121.    From the date of purchase to the present, Plaintiff has serviced her vehicle in a timely and proper manner.

122.    On or near November 23, 2014, Ms. Stebbins was driving on the Garden State Parkway at a speed of about 65-70 mph when she saw that the TPMS warning light come on the dashboard and, almost simultaneously, felt a sudden and unexpected "air-out" of her tire.  Despite her initial loss of control, Ms. Stebbins

–43–

successfully pulled the vehicle over and, upon inspecting the tire, observed that the TPMS module was missing entirely and left a gaping hole in the tire, which was the obvious source of the air-out.

123.   After the incident, she had the vehicle serviced at International Tire and Parts in Linden, NJ.  There, Ms. Stebbins paid out-of-pocket to replace two tires and three TPMS valve stems (the one valve stem from the incident plus two others because they were visibly corroded and cracked).  She has never received a reimbursement from Chrysler.

## Yvette Taylor

124.   In November of 2010, Plaintiff Taylor purchased a used 2010 Dodge Grand Caravan from D.E. Bourque & Sons, Inc. Automotive Service & Sales  in Holyoke, Massachusetts.  Ms. Taylor's Dodge Grand Caravan came with defective TPMS valve stems.  Chrysler did not disclose this fact to Ms. Taylor, who greatly values vehicle safety.

125.   Ms. Taylor uses the Dodge Grand Caravan for family travel on roads near her residency in Massachusetts, where salt is used in the winter.

126.   From the date of purchase to the present, Plaintiff has serviced her vehicle in a timely and proper manner.

127.   Due to the defective nature of the TPMS valve stems, Ms. Taylor has had to replace all of the original valve stems on her Dodge Grand Caravan.

128.   On December 8, 2014, she paid $140.43 out-of-pocket for her mechanic – D.E. Bourque & Sons, Inc. Automotive Service & Sales – to investigate the source of an under-inflated tire (the defective TPMS valve stem) on her Dodge Grand Caravan and replace the leaking TPMS.  The mechanic informed her that the TPMS was corroded and was causing the tire to lose air.  The TPMS was, indeed, visibly corroded in a manner consistent with the photographs above.

129.   On February 5, 2015, she paid $134.49 out-of-pocket for her mechanic – D.E. Bourque & Sons, Inc. Automotive Service & Sales – to investigate the source of a second under-inflated tire on the front passenger side of her Dodge Grand Caravan and to replace a defective TPMS. The mechanic informed her that the TPMS was corroded and was causing the tire to lose air.

130.   On April 27, 2016, she paid $259.76 out-of-pocket for her mechanic – D.E. Bourque & Sons, Inc. Automotive Service & Sales – to remove and replace defective TPMS on tires on the rear passenger side and the front driver side after again experiencing a third under-inflated tire during a vacation trip in her Dodge Caravan.  The mechanic informed her that the TPMS was corroded and was

causing the tire to lose air. Taylor decided to have the remaining two TPMS replaced for safety reasons.

131.    Ms. Taylor has never received reimbursement from Chrysler for her out-of-pocket expenses to replace the defective TPMS valve stems on her Dodge Grand Caravan.

## CLASS ACTION ALLEGATIONS

132. Plaintiffs seek to represent the classes set forth below. "Class Vehicle," as set forth in paragraph 24 above, is defined to include all Chrysler vehicles manufactured after June 10, 2009 with AL 2000 TPMS valve stems.

### Massachusetts Class

Plaintiff Taylor proposes to represent:

*All persons who purchased or leased a Class Vehicle in Massachusetts.*

### New Jersey Class

Plaintiffs Cattano, Spratley and Stebbins propose to represent:

*All persons who purchased or leased a Class Vehicle in New Jersey.*

### Ohio Class

Plaintiff Lett proposes to represent:

*All persons who purchased or leased a Class Vehicle in Ohio.*

### Michigan Class

Plaintiffs Canfield and Peck propose to represent:

*All persons who purchased or leased a Class Vehicle in Michigan.*

133.  Excluded from each proposed class are: FCA US LLC, Chrysler Group and Chrysler Group LLC; any affiliate, parent, or subsidiary of FCA US LLC, Chrysler Group or Chrysler Group LLC; any entity in which FCA US LLC, Chrysler Group or Chrysler Group LLC has a controlling interest; any officer, director, or employee of FCA US LLC, Chrysler Group or Chrysler Group, LLC; any successor or assign of FCA US LLC, Chrysler Group or Chrysler Group LLC; anyone employed by counsel for Plaintiffs in this action; any judge to whom this case is assigned, his or her spouse, and all persons within the third degree of relationship to either of them, as well as the spouses of such persons; and anyone who purchased a Class Vehicle for the purpose of resale.

134.  This action has been brought, and may properly be maintained, on behalf of the classes proposed above, under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

## **NUMEROSITY**

135.  The members of the classes are so numerous that joinder of all members is impracticable.  The precise number of class members can only be ascertained through discovery, which includes Defendant's sales, service,

maintenance and complaint records.  The disposition of their claims through a class action will benefit both the parties and this Court.

## COMMON QUESTIONS OF LAW AND FACT THAT PREDOMINATE

136.   There is a well-defined community of interest in the questions of law and fact affecting the members of each Class.

137.   There are questions of law and fact common to all members of each Class: specifically, Plaintiffs' claims arise from the same event or practice or course of conduct by the Defendant that gives rise to those claims of the putative classes, and Plaintiffs' claims are based upon the same legal theories as those of the putative classes.  The Defendant has engaged in a pattern and practice, in violation of the law, of not informing purchasers or potential purchasers of the known defect in the Class Vehicles' valve stems. The resolution of this issue—to wit, whether Defendants knew about the defect and did not inform Plaintiffs and Class Members—is a common question of fact and law that will affect all members of the class in the same manner.

138.   The questions of law and fact common to the Class predominate over questions that may affect individual members, and include the following:

a.    whether the valve stems manufactured by Defendant in the Class Vehicles contained defects that caused the valve stems to corrode and fall apart;

b.    whether all, or an identifiable portion, of the Class Vehicles possess the defect alleged;

c.    whether the Defendant violated state consumer protection laws;

d.    whether class members are entitled to actual damages and, if so, the appropriate amount thereof;

e.    whether members of the classes are entitled to be notified and warned about the defect and are entitled to the entry of final and injunctive relief compelling Defendant to issue a notification and warning to all class members concerning such a defect;

f.    whether Defendant deliberately failed to disclose material facts to Plaintiffs and the class members; and

g.    whether Defendant manufactured defective valve stems in the TPMS and should replace them, along with any destroyed tires, at no cost to Plaintiffs and the class members, because of the safety hazards presented.

## **TYPICALITY**

139.   The claims and defenses of the Named Plaintiffs are representative of the classes they seek to represent and typical of the claims and defenses of the classes because the Plaintiffs and the class members all owned Class Vehicles with defective valve stems that were manufactured and sold by Defendant.  Plaintiffs, like all class members, purchased their Class Vehicles without having received any warning or notification from Defendant of the defect.

## ADEQUACY OF REPRESENTATION

140.   The Named Plaintiffs will fairly and adequately assert and protect the interests of the proposed classes because:

a.     Plaintiffs have hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the classes;

b.     Plaintiffs have no conflict of interest that will interfere with the maintenance of this class action; and

c.     Plaintiffs have suffered consumer-related injuries and damages.

## SUPERIORITY

141.   A class action provides a fair and efficient method for the adjudication of the instant controversy for the following reasons:

a.    The common questions of law and fact set forth above predominate over any questions affecting only individual class members;

b.    The proposed classes are each so numerous that joinder would prove impracticable.  The proposed classes, however, are not so numerous as to create manageability problems; moreover, no unusual legal or factual issues render the classes unmanageable.

c.    Prosecution of separate actions by individual members of the classes would risk inconsistent and varying adjudications against Defendant;

d.    The claims of the individual class members are small in relation to the expenses of litigation, making a class action the only procedure in which class members can, as a practical matter, recover.

e.    A class action would be superior to, and more efficient than, adjudicating thousands of individual lawsuits.

142.    In the alternative, the proposed classes may be certified because:

a.    the prosecution of separate actions by the individual members of the

proposed classes would create a risk of inconsistent or varying adjudication with respect to individual class members, which would establish incompatible standards of conduct for Chrysler;

–51–

b.    the prosecution of separate actions by individual class members would

create a risk of adjudications dispositive of the interests of other class members not parties to the adjudications and substantially impair or impede their ability to protect their interests; and

c.    Chrysler has acted or refused to act on grounds generally applicable to the

proposed classes, which justifies final and injunctive relief for the members of the proposed classes as a whole.

## ESTOPPEL FROM PLEADING AND TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

143.   As detailed above, the vast majority of information in this Complaint, including defendant's customer complaint and warranty records, internal emails, reports, analyses, and testimony of engineers, was exclusively possessed by Chrysler and unavailable to Plaintiffs and members of the proposed class. This information was only recently made publicly available by the United States District Court for the Northern District of New York in a companion New York-only putative class action involving Chrysler vehicles with AL 2000 series valve stems and nuts.  *See Tomassini v. FCA US LLC*, 3:14-cv-01226 (N.D.N.Y.) (Dkt. Nos. 116, 121, 195, and 196).

144.   Chrysler is estopped from relying on any statutes of limitation or repose due to its acts of concealment.  Defendant knew about the defect in the Class Vehicles for years, but concealed it and/or failed to alert purchasers or potential purchasers.  Defendant maintained exclusive control over information concerning the known, but non-public, valve stem and nut defect and the number of Class Vehicles at issue; Plaintiffs and class members, therefore, could not reasonably have known about the existence of the defect or the number of Class Vehicles affected.  Thus, Defendant is estopped from relying on any statutes of limitations or repose that might otherwise be applicable to the claims asserted herein.

**FIRST CAUSE OF ACTION**
**By Plaintiffs Cattano, Spratley and Stebbins on Behalf of the New Jersey Class**
**For Violation of New Jersey Consumer Fraud Act,**
**N.J. Stat. §56:8-1, *et seq*.**

145.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

146.   Class Vehicles are "merchandise" under N.J. Stat. § 56:8-1(c).

147.   Chrysler is a "person" under N.J. Stat. § 56:8-1(d).

148.   Class members' purchases and leases of Class Vehicles are "sales" under N.J. Stat. § 56:8-1(e).

–53–

149.    Chrysler's conduct, as alleged herein, violated the New Jersey Consumer Fraud Act, N.J. Stat. 56:8-2, in that it used an unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of merchandise or Chrysler's subsequent conduct, including in the following ways:

a.    At the time of sale, Defendant knowingly misrepresented and intentionally omitted and concealed material information regarding the Class Vehicles by failing to disclose to Plaintiffs Cattano, Spratley and Stebbins, along with the New Jersey Class Members, the known defects in the TPMS valve stem and the known risks associated therewith.

b.    Thereafter, Defendant failed to disclose the defects to Plaintiffs Cattano, Spratley and Stebbins, in addition to the New Jersey Class Members, either through warnings or recall notices, and/or actively concealed from them that the Class Vehicles' TPMS valve stems were defective, even though the company knew of such defects: (1) at the time of manufacturing, when it created the valve stems out of metal alloys that cannot sufficiently resist corrosion; (2) at the point where NHTSA began to record complaints about the defect in July 2009; and, at

the very latest, (3) when Transport Canada opened an investigation into the defect in October 2010; and/or (4) when Defendant determined that AL2000 valve stems and nuts were susceptible to stress corrosion cracking; and/or (5) when Defendant undertook it analyses and failure rate predictions as detailed herein which were made available and unsealed in the *Tomassini* action.

      c.     Based on these and, upon information and belief, other internal studies and investigations, Defendant knew with certainty that the valve stems on the vehicles were going to fail.

      d.     Nonetheless, Defendant forced Plaintiffs Cattano, Spratley and Stebbins, as well as the New Jersey Class Members to expend sums of money at its dealerships to repair and/or replace the defective valve stems and deflated tires on the Class Vehicles, despite Defendant's prior knowledge of the defects at the time of purchase.

      e.     Defendant also engaged in materially misleading deceptive acts and practices by advertising and selling a limited warranty while knowing that significant portions of the damages resulting from the known, but concealed, valve stem defect would not be revealed to the consumer until after coverage expired thereunder and that many of the defective valve stems would fail prematurely, but outside the warranty period.

f.      Additionally, Defendant, in administering the limited warranty, engaged in materially misleading deceptive acts and practices by replacing corroded valve stems with equally defective units and refusing to replace valve stems known to be defective until their actual failure.

g.      Furthermore, Defendant engaged in materially misleading and deceptive acts by continuing to sell the Class Vehicles to the consuming public and to represent that these vehicles were in good working order, merchantable, and not defective, despite Defendant's knowledge that the vehicles would not perform as intended, represented, and warranted and that the above described defects would cause purchasers to incur significant out-of-pocket costs and expenses.

150.   The aforementioned conduct is and was deceptive and false and constitutes an unconscionable, unfair, and deceptive act or practice in that Defendant has, through knowing, intentional, material omissions, concealed the true defective nature of the valve stems in the TPMS.

151.   In making these misrepresentations of fact and/or material omissions to prospective customers while knowing such representations to be false, Defendant has misrepresented and/or knowingly and intentionally concealed material facts in breach of its duty not to do so.

152.   Members of the public were deceived by Defendant's failure to disclose and could not discover the defect themselves before suffering their injuries.

153.   As a direct and proximate result of these unconscionable, unfair, and deceptive acts or practices, Plaintiffs Cattano, Spratley and Stebbins, along with the New Jersey Class Members, have been damaged because: they purchased Class Vehicles they otherwise would not have, paid more for Class Vehicles than they otherwise would, paid for TPMS diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the defect.  Meanwhile, Chrysler has sold more Class Vehicles than it otherwise could have and charged inflated prices for Class Vehicles, thereby unjustly enriching itself.

154.   Plaintiffs Cattano, Spratley and Stebbins, along with the New Jersey class, seek restitution of the substantial sums of money they expended, including the expense of replacing their Chrysler Minivans' defective TPMS valve stems and the tires destroyed as a result of the defect, which Defendant knew about prior to the sale of the Class Vehicles.

155.   Plaintiffs Cattano, Spratley and Stebbins, as well as the New Jersey class, also seek appropriate equitable relief, including an order requiring Chrysler

to adequately disclose and remediate the TPMS valve stem defect and an order enjoining Chrysler from incorporating the defective TPMS into its vehicles in the future.

## SECOND CAUSE OF ACTION
### By Plaintiff Lett on Behalf of the Ohio Class
### For Deceptive Conduct in Violation of the Ohio Consumer Sales Practices Act,
### Ohio Rev. Code. § 1345.01, *et seq*.

156.    Plaintiff hereby incorporates by reference the foregoing paragraphs of this Complaint as though set forth fully herein, and further states:

157.    At all times relevant to this suit, Chrysler was a "supplier," as defined in the Ohio Consumer Sales Practices Act.  Ohio Rev. Code § 1345.01.

158.    At all times relevant to this suit, Plaintiff Lett and the Ohio Class members were "consumers," as defined in the Ohio Consumer Sales Practices Act. Ohio Rev. Code § 1345.01.

159.    As a result of placing a defective product into the stream of commerce, Chrysler has breached its implied warranty in tort, which is a deceptive act as defined in Ohio Rev. Code § 1345.09(B).

160.    Chrysler has committed deceptive acts, in violation of Ohio's Consumer Sales Practices Act, by knowingly placing into the stream of commerce Class Vehicles equipped with defective TPMS valve stems that result in, among

other problems, sudden and unexpected tire air-outs.

161.   Moreover, Chrysler has committed deceptive, and unconscionable acts by knowingly concealing the defect in the Class Vehicles, failing to inform Plaintiff Lett and the other Ohio Class members of this defect, and in the following ways:

a.   At the time of sale, Defendant knowingly misrepresented and intentionally omitted and concealed material information regarding the Class Vehicles by failing to disclose to Plaintiff Lett and Ohio Class Members the known defects in the TPMS valve stem and the known risks associated therewith.

b.   Thereafter, Defendant failed to disclose the defects to Plaintiff Lett and the Ohio Class Members, either through warnings or recall notices, and/or actively concealed from them the fact that the Class Vehicles' TPMS valve stems were defective, even though Chrysler knew of such defects: (1) at the time of manufacturing, when it created the valve stems out of metal alloys that cannot sufficiently resist corrosion; (2) at the point where NHTSA began to record complaints about the defect in July 2009; and, at the very latest, (3) when Transport Canada opened an investigation into the defect in October 2010; and/or (4) when Defendant determined that AL2000 valve stems and nuts were susceptible to stress corrosion cracking; and/or (5) when Defendant undertook its

analyses and failure rate predictions as detailed herein which were made available and unsealed in the *Tomassini* action.

c.    Defendant forced Plaintiff Lett and Ohio Class Members to expend sums of money at its dealerships and elsewhere to repair and/or replace the defective valve stems and deflated tires on the Class Vehicles, despite Defendant's prior knowledge of the defects at the time of purchase.

d.    Defendant also engaged in materially misleading deceptive acts and practices by advertising and selling a limited warranty while knowing that significant portions of the damages resulting from the known, but concealed, valve stem defect would not be revealed to the consumer until after coverage expired thereunder and that many of the defective valve stems would fail prematurely, but outside the warranty period.

e.    Additionally, Defendant, in administering the limited warranty, engaged in materially misleading deceptive acts and practices by replacing corroded valve stems with equally defective units and refusing to replace valve stems known to be defective until their actual failure.

f.    Furthermore, Defendant engaged in materially misleading and deceptive acts by continuing to sell the Class Vehicles to the consuming public and to represent that these vehicles were in good working order, merchantable, and not

defective, despite Defendant's knowledge that the vehicles would not perform as intended, represented, and warranted and that the above described defects would cause purchasers to incur significant out-of-pocket costs and expenses.

162.   The aforementioned conduct is and was deceptive and false and constitutes an unconscionable and deceptive act or practice in that Defendant has, through knowing, intentional, and material omissions, concealed the true defective nature of the TPMS valve stems.

163.   By making these misrepresentations of fact and/or material omissions to prospective customers while knowing such representations to be false, Defendant has misrepresented and/or knowingly and intentionally concealed material facts in breach of its duty not to do so.

164.   Members of the public were deceived by Defendant's failure to disclose and could not discover the defect themselves before suffering their injuries.

165.   The Ohio Attorney General has made available for public inspection prior state court decisions which have held that acts and omissions similar to kinds alleged in this Complaint, including, but not limited to, the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of Ohio's Consumer Sales Practices Act.  These cases include, but are not

limited to, the following:

    a.  *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

    b.  *State ex rel. Betty D. Montgomery v. Ford Motor Co.* (OPIF #10002123);

    c.  *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

    d.  *Bellinger v. Hewlett-Packard Co.,* No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

    e.  *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

    f.  *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

    g.  *Mark J. Cranford, et al. v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

    h.  *State ex rel. William J. Brown v. Harold Lyons, et al.* (OPIF #10000304);

    i.  *Brinkman v. Mazda Motor of America, Inc.,* (OPIF #10001427);

    j.  *Khouri v. Don Lewis*, (OPIF #100001995);

    k.  *Mosley v. Performance Mitsubishi aka Automanage*, (OPIF #10001326);

    l.  *Walls v. Harry Williams dba Butch's Auto Sales*, (OPIF #10001524); and,

    m.  *Brown v. Spears*, (OPIF #10000403).

166.   Chrysler committed these and other deceptive acts in connection with the marketing and sale of the Class Vehicles.

167.   As a direct and proximate result of these unconscionable and deceptive acts or practices, Plaintiff Lett and Ohio Class Members have been damaged because they: purchased Class Vehicles they otherwise would not have purchased, paid more for Class Vehicles than they otherwise would have paid, paid for TPMS diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the defect. Meanwhile, Chrysler has sold more Class Vehicles than it otherwise could and charged inflated prices for Class Vehicles, thereby unjustly enriching itself.

168.   Plaintiff Lett and Ohio Class Members seek restitution of the substantial sums of money they expended, including to replace their Chrysler Minivans' defective TPMS valve stems and the tires destroyed as a result of the defect, which Defendant knew about prior to the sale of the Class Vehicles.

169.   Plaintiff Lett and the Ohio Class also seek appropriate equitable relief, including an order requiring Chrysler to adequately disclose and remediate the TPMS valve stem defect and enjoining Chrysler from incorporating the defective TPMS into its vehicles in the future.

170.   Chrysler is liable to Plaintiff Lett and the other Ohio Class members for compensatory damages, injunctive/equitable relief, and attorneys' fees pursuant to Ohio Rev. Code § 1345.09.

**THIRD CAUSE OF ACTION**
**By Plaintiff Lett on Behalf of the Ohio Class**
**For Unfair Conduct in Violation of the Ohio Consumer Sales Practices Act,**
**Ohio Rev. Code. § 1345.01, *et seq*.**

171.   Plaintiff hereby incorporates by reference the allegations contained in the all paragraphs of this Complaint as though set forth fully herein.

172.   At all times relevant to this suit, Chrysler was a "supplier," as defined in the Ohio Consumer Sales Practices Act.  Ohio Rev. Code § 1345.01.

173.   At all times relevant to this suit, Plaintiff Lett and the Ohio Class members were "consumers," as defined in the Ohio Consumer Sales Practices Act. Ohio Rev. Code § 1345.01.

174.   Defendant's practices, acts, policies, and course of conduct, including its omissions described above, constitute unfair conduct because they (1) offend public policy; (2) are immoral, unethical, oppressive and unscrupulous; and (3) cause substantial injury to consumers in violation of the Ohio Consumer Sales Practices Act.

175.   As a result of placing a defective product into the stream of commerce, Chrysler has breached its implied warranty in tort, which is an unfair

–64–

act as defined in Ohio Rev. Code § 1345.09(B).

176.    Chrysler has committed unfair acts, in violation of Ohio's Consumer Sales Practices Act, by knowingly placing into the stream of commerce Class Vehicles equipped with defective TPMS valve stems that result in, among other problems, sudden and unexpected tire air-outs.

177.    Moreover, Chrysler has committed unfair acts by failing to disclose the defect in the Class Vehicles and failing to inform Plaintiff Lett and the other Ohio Class members of this defect, and in the following ways:

    a.    At the time of sale, Defendant omitted material information regarding the Class Vehicles by failing to disclose to Plaintiff Lett and Ohio Class Members the known defects in the TPMS valve stem and the known risks associated therewith.

    b.    Thereafter, Defendant failed to disclose the defects to Plaintiff Lett and the Ohio Class Members, either through warnings or recall notices, and/or actively concealed from them the fact that the Class Vehicles' TPMS valve stems were defective, even though Chrysler knew of such defects: (1) at the time of manufacturing, when it created the valve stems out of metal alloys that cannot sufficiently resist corrosion; (2) at the point where NHTSA began to record complaints about the defect in July 2009; and, at the very latest, (3) when

Transport Canada opened an investigation into the defect in October 2010; and/or (4) when Defendant determined that AL2000 valve stems and nuts were susceptible to stress corrosion cracking; and/or (5) when Defendant undertook its analyses and failure rate predictions as detailed herein which were made available and unsealed in the *Tomassini* action.

    c. Defendant caused Plaintiff Lett and Ohio Class Members to expend sums of money at its dealerships and elsewhere to repair and/or replace the defective valve stems and deflated tires on the Class Vehicles, despite Defendant's prior knowledge of the defects at the time of purchase.

    d. Defendant also engaged in unfair acts and practices by advertising and selling a limited warranty while knowing that significant portions of the damages resulting from the valve stem defect would not be revealed to the consumer until after coverage expired thereunder and that many of the defective valve stems would fail prematurely, but outside the warranty period.

    e. Additionally, Defendant, in administering the limited warranty, engaged in materially unfair acts and practices by replacing corroded valve stems with equally defective units and refusing to replace valve stems known to be defective until their actual failure.

f.    Furthermore, Defendant engaged in unfair acts by continuing to sell the Class Vehicles to the consuming public and to represent that these vehicles were in good working order, merchantable, and not defective, despite Defendant's knowledge that the vehicles would not perform as intended, represented, and warranted and that the above described defects would cause purchasers to incur significant out-of-pocket costs and expenses.

178.    The aforementioned conduct is and was an unfair act or practice in that Defendant has, through material omissions, failed to disclose the true defective nature of the TPMS valve stems.

179.    With these material omissions to prospective customers, Defendant has failed to disclose material facts in breach of its duty not to do so.

180.    Members of the public could not discover the defect themselves before suffering their injuries.

181.    The Ohio Attorney General has made available for public inspection prior state court decisions which have held that unfair acts and omissions similar to kinds alleged in this Complaint, including, but not limited to, the non-disclosure of a dangerous defect, constitute unfair sales practices in violation of Ohio's Consumer Sales Practices Act.  These cases include, but are not limited to, the following:

    a.  *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

    b.  *State ex rel. Betty D. Montgomery v. Ford Motor Co.* (OPIF #10002123);

    c.  *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

    d.  *Bellinger v. Hewlett-Packard Co.,* No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

    e.  *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

    f.  *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

    g.  *Mark J. Cranford, et al. v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

    h.  *State ex rel. William J. Brown v. Harold Lyons, et al.* (OPIF #10000304);

    i.  *Brinkman v. Mazda Motor of America, Inc.,* (OPIF #10001427);

    j.  *Khouri v. Don Lewis*, (OPIF #100001995);

    k.  *Mosley v. Performance Mitsubishi aka Automanage*, (OPIF #10001326);

    l.  *Walls v. Harry Williams dba Butch's Auto Sales*, (OPIF #10001524); and,

    m.  *Brown v. Spears*, (OPIF #10000403).

182. Chrysler committed these and other unfair acts in connection with the marketing and sale of the Class Vehicles.

183. As a direct and proximate result of these unfair acts or practices, Plaintiff Lett and Ohio Class Members have been damaged because they: purchased Class Vehicles they otherwise would not have purchased, paid more for Class Vehicles than they otherwise would have paid, paid for TPMS diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the defect. Meanwhile, Chrysler has sold more Class Vehicles than it otherwise could and charged inflated prices for Class Vehicles, thereby unjustly enriching itself.

184. Plaintiff Lett and Ohio Class Members seek restitution of the substantial sums of money they expended, including to replace their Chrysler Minivans' defective TPMS valve stems and the tires destroyed as a result of the defect, which Defendant knew about prior to the sale of the Class Vehicles.

185. Plaintiff Lett and the Ohio Class also seek appropriate equitable relief, including an order requiring Chrysler to adequately disclose and remediate the TPMS valve stem defect and enjoining Chrysler from incorporating the defective TPMS into its vehicles in the future.

186.   Chrysler is liable to Plaintiff Lett and the other Ohio Class members for compensatory damages, injunctive/equitable relief, and attorneys' fees pursuant to Ohio Rev. Code § 1345.09.

## FOURTH CAUSE OF ACTION
**By Plaintiffs Canfield and Peck on Behalf of the Michigan Class**
**For Deceptive Trade Practices in Violation of Michigan Consumer Protection**
**Act ("MCPA"), Michigan Comp. Laws Ann. § 445.903 *et seq*.**

187.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

188.   Plaintiffs Canfield and Peck assert this cause of action on behalf of themselves and the Michigan Class under the "deceptive conduct" branch of the MCPA.

189.   At all relevant times hereto, Defendant was a "person" engaged in "trade or commerce" within the meaning of MCPA, M.C.L.A. § 445.902(1)(d) and (g).

190.   Defendant's practices, acts, policies, and course of conduct, including its omissions described above, were intended to induce, and did induce, Plaintiffs Canfield and Peck, and members of the Michigan Class, to purchase the above-mentioned Class Vehicles with defective TPMS valve stems.

191.    Defendant sold and/or leased the Class Vehicles while knowingly concealing that they contained the defects alleged above.

192.    Acts by Defendant are and were deceptive acts or practices which are and/or were, likely to mislead a reasonable consumer purchasing the vehicle. The aforementioned deceptive acts and practices are material, in part, because they concern an essential facet of the Class Vehicles' functionality and safety.

193.    Defendant's practices, acts, policies and course of conduct violated the MCPA, M.C.L.A. § 445.902(1) in that:

    a.    At the time of sale, Defendant knowingly misrepresented and intentionally omitted and concealed material information regarding the Class Vehicles by failing to disclose to Plaintiffs Canfield and Peck, as well as the Michigan Class Members, the known defects in the TPMS valve stem and the known risks associated therewith.

    b.    Thereafter, Defendant failed to disclose the defects to Plaintiffs Canfield and Peck, in addition to the Michigan Class Members, either through warnings or recall notices, and/or actively concealed from them the fact that the Class Vehicles' TPMS valve stems were defective, even though Chrysler knew of such defects: (1) at the time of manufacturing, when it created the valve stems out of metal alloys

that cannot sufficiently resist corrosion; (2) at the point where NHTSA began to record complaints about the defect in July 2009; and, at the very latest, (3) when Transport Canada opened an investigation into the defect in October 2010; and/or (4) when Defendant determined that AL2000 valve stems and nuts were susceptible to stress corrosion cracking; and/or (5) when Defendant undertook its analyses and failure rate predictions as detailed herein which were made available and unsealed in the *Tomassini* action.

c.      Defendant forced Plaintiffs Canfield and Peck, and the Michigan Class Members, to expend sums of money at its dealerships to repair and/or replace the defective valve stems and deflated tires on the Class Vehicles, despite Defendant's prior knowledge of the defects at the time of purchase.

d.      Defendant also engaged in materially misleading deceptive acts and practices by advertising and selling a limited warranty while knowing that significant portions of the damages resulting from the known, but concealed, valve stem defect would not be revealed to the consumer until after coverage expired thereunder and that many of the

defective valve stems would fail prematurely, but outside the warranty period.

e.      Additionally, Defendant, in administering the limited warranty, engaged in materially misleading deceptive acts and practices by replacing corroded valve stems with equally defective units and refusing to replace valve stems known to be defective until their actual failure.

f.      Furthermore, Defendant engaged in materially misleading and deceptive acts by continuing to sell the Class Vehicles to the consuming public and to represent that these vehicles were in good working order, merchantable, and not defective, despite Defendant's knowledge that the vehicles would not perform as intended, represented, and warranted and that the above described defects would cause purchasers to incur significant out-of-pocket costs and expenses.

194. The aforementioned conduct is and was deceptive and false and constitutes an unconscionable and deceptive act or practice in that Defendant has, through knowing, intentional, and material omissions, concealed the true defective nature of the TPMS valve stems.

195.   In making these misrepresentations of fact and/or material omissions to prospective customers while knowing such representations to be false, Defendant has misrepresented and/or knowingly and intentionally concealed material facts in breach of its duty not to do so.

196.  Members of the public reasonably relied on Defendant's misrepresentations as to the quality and characteristics of the Class Vehicles, were deceived by Defendant's failure to disclose, and could not discover the defect themselves before suffering their injuries.

197.  As a direct and proximate result of these unconscionable and deceptive acts or practices, Plaintiffs Canfield and Peck and Michigan Class Members have been damaged because they: purchased Class Vehicles they otherwise would not have purchased, paid more for Class Vehicles than they otherwise would have paid, paid for TPMS diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the defect.  Meanwhile, Chrysler sold more Class Vehicles than it otherwise could and charged inflated prices for Class Vehicles, thereby unjustly enriching itself.

198.   Plaintiffs Canfield and Peck, along with the Michigan Class Members, seek restitution of the substantial sums of money they expended, including to

replace their Class Vehicles' defective TPMS valve stems and the tires destroyed as a result of the defect, which Defendant knew about prior to the sale of the Class Vehicles.

199.    Chrysler committed these and other unfair and deceptive acts in connection with the marketing and sale of the Class Vehicles.  Chrysler is liable to Plaintiffs Canfield and Peck, as well as the other Michigan Class members for monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiffs and each Class Member.  Plaintiffs Canfield and Peck and the Michigan Class Members also seek reasonable attorneys' fees and equitable relief, including an order requiring Chrysler to adequately disclose and remediate the TPMS valve stem defect and enjoining Chrysler from incorporating the defective TPMS into its vehicles in the future, as well as any other just and proper relief available under the Mich. Comp. L. Ann. § 445.911.

### FIFTH CAUSE OF ACTION
**By Plaintiffs Canfield and Peck on Behalf of the Michigan Class**
**For Unfair Trade Practices in Violation of Michigan Consumer Protection**
**Act ("MCPA"), Michigan Comp. Laws Ann. § 445.903 *et seq*.**

200.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding of this Complaint as though set forth fully herein.

201.    Plaintiffs Canfield and Peck assert this cause of action on behalf of themselves and the Michigan Class under the "unfair conduct" branch of the MCPA.

202.    At all relevant times hereto, Defendant was a "person" engaged in "trade or commerce" within the meaning of MCPA, M.C.L.A. § 445.902(1)(d) and (g).

203.    Defendant's practices, acts, policies, and course of conduct, including its omissions described above, constitute unfair conduct because they (1) offend public policy; (2) are immoral, unethical, oppressive and unscrupulous; and (3) cause substantial injury to consumers in violation of the MCPA.

204.    Defendant sold and/or leased the Class Vehicles while knowing that they contained the defects alleged above.

205.    Acts by Defendant are and were unfair to a reasonable consumer purchasing the vehicle. The unfair acts and practices are material, in part, because they concern an essential facet of the Class Vehicles' functionality and safety.

206.    Defendant's practices, acts, policies and course of conduct violated the MCPA, M.C.L.A. § 445.902(1) in that:

a.    At the time of sale, Defendant omitted material information regarding the Class Vehicles by failing to disclose to Plaintiffs

Canfield and Peck, as well as the Michigan Class Members, the known defects in the TPMS valve stem and the known risks associated therewith.

b.      Thereafter, Defendant failed to disclose the defects to Plaintiffs Canfield and Peck, in addition to the Michigan Class Members, either through warnings or recall notices, and/or omitted from them the fact that the Class Vehicles' TPMS valve stems were defective, even though Chrysler knew of such defects: (1) at the time of manufacturing, when it created the valve stems out of metal alloys that cannot sufficiently resist corrosion; (2) at the point where NHTSA began to record complaints about the defect in July 2009; and, at the very latest, (3) when Transport Canada opened an investigation into the defect in October 2010; and/or (4) when Defendant determined that AL2000 valve stems and nuts were susceptible to stress corrosion cracking; and/or (5) when Defendant undertook its analyses and failure rate predictions as detailed herein which were made available and unsealed in the *Tomassini* action.

c.      Defendant caused Plaintiffs Canfield and Peck, and the Michigan Class Members, to expend sums of money at its dealerships

to repair and/or replace the defective valve stems and deflated tires on the Class Vehicles, despite Defendant's prior knowledge of the defects at the time of purchase.

d.      Defendant also engaged in unfair acts and practices by advertising and selling a limited warranty while knowing that significant portions of the damages resulting from the valve stem defect would not be revealed to the consumer until after coverage expired thereunder and that many of the defective valve stems would fail prematurely, but outside the warranty period.

e.      Additionally, Defendant, in administering the limited warranty, engaged in materially unfair acts and practices by replacing corroded valve stems with equally defective units and refusing to replace valve stems known to be defective until their actual failure.

f.      Furthermore, Defendant engaged in materially unfair acts by continuing to sell the Class Vehicles to the consuming public and to represent that these vehicles were in good working order, merchantable, and not defective, despite Defendant's knowledge that the vehicles would not perform as intended, represented, and

warranted and that the above described defects would cause purchasers to incur significant out-of-pocket costs and expenses.

207. The aforementioned conduct is and was unfair in that Defendant has failed to disclose the true defective nature of the TPMS valve stems.

208. In making these material omissions to prospective customers while knowing such representations to be false, Defendant has omitted material facts in breach of its duty not to do so.

209. Members of the public reasonably relied on Defendant's representations as to the quality and characteristics of the Class Vehicles, and could not discover the defect themselves before suffering their injuries.

210. As a direct and proximate result of these unfair acts or practices, Plaintiffs Canfield and Peck and Michigan Class Members have been damaged because they: purchased Class Vehicles they otherwise would not have purchased, paid more for Class Vehicles than they otherwise would have paid, paid for TPMS diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the defect. Meanwhile, Chrysler sold more Class Vehicles than it otherwise could and charged inflated prices for Class Vehicles, thereby unjustly enriching itself.

211. Plaintiffs Canfield and Peck, along with the Michigan Class Members, seek restitution of the substantial sums of money they expended, including to replace their Class Vehicles' defective TPMS valve stems and the tires destroyed as a result of the defect, which Defendant knew about prior to the sale of the Class Vehicles.

212. Chrysler committed these and other unfair acts in connection with the marketing and sale of the Class Vehicles. Chrysler is liable to Plaintiffs Canfield and Peck, as well as the other Michigan Class members for monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiffs and each Class Member. Plaintiffs Canfield and Peck and the Michigan Class Members also seek reasonable attorneys' fees and equitable relief, including an order requiring Chrysler to adequately disclose and remediate the TPMS valve stem defect and enjoining Chrysler from incorporating the defective TPMS into its vehicles in the future, as well as any other just and proper relief available under the Mich. Comp. L. Ann. § 445.911.

### SIXTH CAUSE OF ACTION
**By Plaintiffs Canfield and Peck on Behalf of the Michigan Class**
**For Breach of the Implied Warranty of Merchantability**

213.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

214.   Plaintiffs Canfield and Peck assert this cause of action on behalf of themselves and the Michigan class.

215.   The Class Vehicles are "goods" within the meaning of Mich. Comp. Laws Ann. § 440.2314.

216.   A warranty that goods shall be merchantable and fit for the ordinary purposes for which such goods are used is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.

217.   As the manufacturer of the Class Vehicles who also sells them through its dealers, Chrysler is a "merchant" within the meaning of Mich. Comp. Laws Ann. § 440.2104 with respect to the Class Vehicles.

218.   Chrysler's implied warranty that the Class Vehicles were merchantable was part of the basis of the bargain between Chrysler and Plaintiffs and members of the Michigan Class.

219.   Chrysler has not validly disclaimed, excluded, or modified the implied warranties and/or duties described herein, and/or any attempted disclaimer or exclusion of the same was and is ineffectual.

220.   The Class Vehicles are not merchantable because the TPMS valve stems contain a dangerous safety defect in which they inevitably corrode when exposed to elements like road salt, leading to an unforeseeable tire air-out at any speed.  Accordingly, the TPMS valve stems not of fair average quality within the description and are not fit for the ordinary purposes for which such goods are used.

221.   Chrysler was provided notice of these issues and defects through 160 NHTSA complaints, online forums discussing the issue, an open Transport Canada investigation on the defect, actual notice from its consumers, directly and through its dealers, all of the facts alleged herein that were made available and unsealed in the *Tomassini* action, and the instant action previously filed in the United States District Court for the Eastern District of New York.

222.   As a direct and proximate result of Chrysler's breach of the warranties of merchantability, Plaintiffs and members of the Michigan Class have been damaged in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**By Plaintiff Taylor on Behalf of the Massachusetts Class for Deceptive Acts and Practices in Violation of Massachusetts' Consumer Protection Act, Mass. Gen Laws, ch. 93A, *et. seq.***

223.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

224.   Plaintiff Taylor asserts this cause of action on behalf of herself and the Massachusetts Class.

225.   Mass. Gen. Laws ch. 93A § 2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

226.   At all relevant times, Chrysler was engaged in commerce within the meaning of Mass. Gen. Laws, ch. 93A.

227.   As alleged more fully herein, Chrysler has violated Mass. Gen. Laws, ch. 93A in that it used unconscionable business practices by failing to disclose, at the point of sale or otherwise, that the TPMS valve stems in Class Vehicles are defective and pose a safety hazard.

228.   As a direct and proximate result of Chrysler's conduct, Plaintiff Taylor and other members of the Massachusetts class have been harmed in that they purchased Class Vehicles they otherwise would not have, paid more for Class Vehicles than they otherwise would, paid for TPMS diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the defect.  Meanwhile, Chrysler has sold more Class Vehicles than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

229.   Pursuant to Mass. Gen. Laws ch. 93A § 3, Plaintiff Taylor seeks damages and appropriate equitable relief, including an order requiring Chrysler to adequately disclose and repair the TPMS defect, and an order enjoining Chrysler from incorporating the defective TPMS into its vehicles in the future.

230.   Plaintiff Taylor, on behalf of herself and class members, made a written demand for relief to Chrysler at least thirty (30) days prior to filing this complaint, on June 10, 2016, as required by Mass. Gen. Laws ch. 93A § 9.5. Chrysler has declined Plaintiff's request.

231.   Based on the foregoing, Plaintiff Taylor and the Massachusetts Class are entitled to all remedies available pursuant to Mass. Gen. Laws ch. 93A, § 9, including refunds, actual damages, or statutory damages in the amount of 25 dollars per violation, whichever is greater, double or treble damages, attorney fees and other reasonable costs.  Plaintiff Taylor and the Massachusetts Class also request that the Court award equitable relief, including an order requiring Chrysler to adequately disclose and repair the TPMS defect and an order enjoining Chrysler from incorporating the defective TPMS valve stems into its vehicles in the future.

## EIGHTH CAUSE OF ACTION
**By Plaintiff Taylor on Behalf of the Massachusetts Class for Unfair Acts and Practices in Violation of Massachusetts' Consumer Protection Act, Mass. Gen Laws, ch. 93A, *et. seq.***

---

5 Due to a dispute between the parties concerning material disclosed in the letter, it was designated as confidential.

–84–

232.  Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

233.  Plaintiff Taylor asserts this cause of action on behalf of herself and the Massachusetts Class.

234.  Mass. Gen. Laws ch. 93A § 2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

235.  At all relevant times, Chrysler was engaged in commerce within the meaning of Mass. Gen. Laws, ch. 93A.

236.  As alleged more fully herein, Chrysler has violated Mass. Gen. Laws, ch. 93A in that it used unfair business practices by failing to disclose, at the point of sale or otherwise, that the TPMS valve stems in Class Vehicles are defective and pose a safety hazard.

237.  Defendant's practices, acts, policies, and course of conduct, including its omissions described above, constitute unfair conduct because they (1) offend public policy; (2) are immoral, unethical, oppressive and unscrupulous; and (3) cause substantial injury to consumers in violation of Mass. Gen. Laws, ch. 93A.

238.  As a direct and proximate result of Chrysler's conduct, Plaintiff Taylor and other members of the Massachusetts class have been harmed in that

they purchased Class Vehicles they otherwise would not have, paid more for Class Vehicles than they otherwise would, paid for TPMS diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the defect.  Meanwhile, Chrysler has sold more Class Vehicles than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

239.   Pursuant to Mass. Gen. Laws ch. 93A § 3, Plaintiff Taylor seeks damages and appropriate equitable relief, including an order requiring Chrysler to adequately disclose and repair the TPMS defect, and an order enjoining Chrysler from incorporating the defective TPMS into its vehicles in the future.

240.   Plaintiff Taylor, on behalf of herself and class members, made a demand for relief, in writing, to Chrysler at least thirty (30) days prior to filing this complaint, on June 10, 2016, as required by Mass. Gen. Laws ch. 93A § 9.6. Chrysler has declined Plaintiff's request.

241.   Based on the foregoing, Plaintiff Taylor and the Massachusetts Class are entitled to all remedies available pursuant to Mass. Gen. Laws ch. 93A, § 9, including refunds, actual damages, or statutory damages in the amount of 25 dollars per violation, whichever is greater, double or treble damages, attorney fees

---

6 Due to a dispute between the parties concerning material disclosed in the letter, it was designated as confidential.

and other reasonable costs.  Plaintiff Taylor and the Massachusetts Class also request that the Court award equitable relief, including an order requiring Chrysler to adequately disclose and repair the TPMS defect and an order enjoining Chrysler from incorporating the defective TPMS valve stems into its vehicles in the future.

## NINTH CAUSE OF ACTION
### By Plaintiff Taylor on Behalf of the Massachusetts Class
### For Breach of the Implied Warranty of Merchantability Under Massachusetts Law, M.G. L. §§ 2-314, 2-315

242.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

243.   Plaintiff Taylor asserts this cause of action on behalf of herself and the Massachusetts class.

244.   The Class Vehicles are "goods" within the meaning of Massachusetts law.

245.   A warranty that goods shall be merchantable and fit for the ordinary purposes for which such goods are used is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.

246.   As the manufacturer of the Class Vehicles who also sells them through its dealers, Chrysler is a "merchant" within the meaning of Massachusetts Law and with respect to the Class Vehicles.

247. Chrysler's implied warranty that the Class Vehicles were merchantable was part of the basis of the bargain between Chrysler and Plaintiffs and members of the Massachusetts Class.

248. The Class Vehicles are not merchantable because the TPMS valve stems contain a dangerous safety defect in which they inevitably corrode when exposed to elements like road salt, leading to an unforeseeable tire air-out at any speed. Accordingly, the TPMS valve stems not of fair average quality within the description and are not fit for the ordinary purposes for which such goods are used.

249. Chrysler was provided notice of these issues and defects through 160 NHTSA complaints, online forums discussing the issue, an open Transport Canada investigation on the defect, actual notice from its consumers, directly and through its dealers, all of the facts alleged herein that were made available and unsealed in the *Tomassini* action, and the instant action previously filed in the United States District Court for the Eastern District of New York.

250. As a direct and proximate result of Chrysler's breach of the warranties of merchantability, Plaintiff and members of the Massachusetts Class have been damaged in an amount to be proven at trial.

## TENTH CAUSE OF ACTION
### By Plaintiffs on Behalf of their Respective State Classes
### For Breach of Express Warranty

251.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

252.   Plaintiffs asserts this cause of action on behalf of themselves and the state classes that they seek to represent.

253.   At all times relevant hereto, Defendant was engaged in the business of designing, manufacturing, testing, inspecting, distributing, marketing, and/or selling the Class Vehicles to Plaintiffs and Class Members.

254.   At all times relevant hereto, the Class Vehicles were manufactured, assembled, designed and placed into the stream of commerce by Defendant.

255.   Defendant manufactured, marketed, selected the materials and qualities of such materials to be used and/or distributed Class Vehicles that were defective in manufacture, workmanship and/or materials when the Class Vehicles left the hands of Defendant.

256.   When the Class Vehicles left the hands of Defendant, they were unreasonably dangerous, and more so than a purchaser could expect. A purchaser could neither determine that the material used to create the valve stems would fail to resist corrosion, nor anticipate that the defective valve stems would corrode to the point of fracturing and rapidly releasing air from the tires.

–89–

257.   Plaintiffs and Class Members, acting as reasonably prudent people, could not discover that the Class Vehicles were defective as described herein, nor perceive the danger of the defective valve stems.

258.   Plaintiffs and Class Members utilized their Class Vehicles for the purpose, and in the manner, normally intended.

259.   Plaintiffs and Class Members are beneficiaries of certain written warranty agreements with Chrysler.   Pursuant to the Basic Limited Warranty, Chrysler agreed to provide Plaintiffs and the Class Members with Class Vehicles in proper working order to cover "the cost of all parts and labor needed to repair any item … that is defective in material, workmanship, or factory preparation." The warranty does not extend to tires, unwired headphones, or items added to the vehicle after it left the manufacturing plant.   The Basic Limited Warranty covers the instant defective valve stems for "36 months [from the date Class Members took delivery of the vehicle or the date when the vehicles were first put into service, whichever is earlier] … or for 36,000 miles on the odometer, whichever occurs first."   But for its unconscionable time limits, the Basic Limited Warranty obligates Defendant to pay for the service and replacement of the defective valve stems in the TPMS.

260. Chrysler knew, or should have known, that the Class Vehicles were inherently dangerous and unsafe when they used AL2000 that cannot sufficiently withstand corrosion as the base metal alloy of the Class Vehicles' TPMS valve stems. The use of this metal alloy has caused the valve stems to inevitably corrode when exposed to elements like road salt, leading to an unforeseeable tire air-out at any speed. This defect caused Plaintiffs and Class Members injuries and damages.

261. As a direct, proximate, and foreseeable result of the defective condition of the Class Vehicles as manufactured and sold by Defendant, Plaintiffs and Class Members have suffered, and will continue to suffer, injury and damages.

262. Any notice and/or presentment requirements for the warranty are satisfied by Chrysler's prior knowledge of the ubiquitous and inevitable nature of the defect from, among other sources, its testing, customer complaints, disclosures from its suppliers and the consensus among metallurgists that AL2000 is particularly susceptible to stress corrosion cracking.

263. Chrysler violated the Basic Limited Warranty and any implied covenant of good faith inherent in such agreement by selling Plaintiffs and the Class Members Class Vehicles with limited warranties under circumstances in which Chrysler knew or should have known that the defective valve stems would

fail prematurely, and sometimes beyond the warranty period, particularly when a defective valve stem was replaced with another defective valve stem.

264.   At the point of purchase for Plaintiffs and Class Members, Chrysler knew, or should have known, that the defect in the valve stems would cause the valve stems to inevitably corrode when exposed to elements like road salt, leading to an unforeseeable tire air-out at any speed, even after the warranty periods had lapsed, particularly when a defective valve stem was replaced with another defective valve stem.  But, Chrysler used its superior knowledge of the existing defect to offer a warranty that it knew, or should have known, would not cover the valve stem, the cost of replacement tires and other damages.  Chrysler's patently unconscionable conduct in both concealing the Class Vehicles' defect and crafting an unusable or illusory warranty renders the warranty's durational limitations unenforceable pursuant to the commercial code of each putative state class.  Thus, Chrysler breached the express warranty by providing Plaintiffs and Class Members with Class Vehicles that contained defective valve stems and refusing to repair or replace the valve stems and the tires that deflated as a result of the defect.

265.   As a direct and proximate result of Chrysler's breach of express warranty, Plaintiffs and Class Members are entitled to compensatory damages in an amount to be proven at trial, and punitive damages because Defendant acted in a

manner contrary to public purpose and with intent to exclude defective valve stems from the warranty's coverage.  In addition, Plaintiffs seek a declaratory judgment requiring Chrysler to adequately disclose and repair the TPMS defect and an order enjoining Chrysler from incorporating the defective TPMS valve stems into its vehicles in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

a.    For an order certifying the proposed classes and appointing Plaintiffs and their counsel to represent the classes;

b.    For an order awarding Plaintiffs and the members of the classes actual, statutory, punitive, and/or any other form of damages provided by and pursuant to the statutes cited above;

c.    For an order awarding Plaintiffs and the class members restitution, disgorgement and/or other equitable relief provided by and pursuant to the statutes cited above or as the Court deems proper;

d.    For an order or orders requiring Chrysler to adequately disclose and remediate the TPMS defect and enjoining Chrysler from incorporating the defective TPMS into its vehicles in the future;

e.      For an order awarding Plaintiffs and the class members of the

classes pre-judgment and post-judgment interest;

f.      For an order awarding Plaintiffs and the members of the classes

reasonable attorney fees and costs of suit, including expert witness

fees; and

g.      For an order awarding such other and further relief as this Court

may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury on all claims so triable.


Dated: February 1, 2018

By:     _/s/ P. Bradford deLeeuw_
        Jeffrey S. Goddess (No. 630)
        P. Bradford deLeeuw (No. 3569)
        Rosenthal, Monhait & Goddess, P.A.
        919 N. Market Street, Suite 1401
        Wilmington, DE 19801
        (302) 656-4433
        bdeleeuw@rmgglaw.com

OF COUNSEL:

Nicholas A. Migliaccio, Esq.
Jason S. Rathod, Esq.
Migliaccio & Rathod LLP
412 H Street N.E., Ste. 302
Washington, DC 20002
Tel: (202) 470-3520

Gary S. Graifman, Esq.

Jay I. Brody, Esq.
Kantrowitz Goldhamer
& Graifman, P.C.
747 Chestnut Ridge Road, Suite 200
Chestnut Ridge, New York 10977
Tel: (845) 356-2570

Gary E. Mason, Esq.
Jennifer S. Goldstein, Esq.
Whitfield Bryson & Mason LLP
5101 Wisconsin Ave NW, Suite 305
Washington, DC 20016
Tel: (202) 429-2290

Elmer Robert Keach, III, Esq.
Law Offices Of Elmer Robert Keach III, P.C.
1040 Riverfront Center
P. O. Box 70
Amsterdam, NY  12010
Tel: (518) 434-1718

Daniel Calvert, Esq.
Parker Waichman LLP
27300 Riverview Center Boulevard
Suite 103
Bonita Springs, Florida 34134
Tel: (239) 390-1000